**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street, N.E.<br>Washington, D.C. 20549 )<br><br>Plaintiff, )<br><br>v. )<br><br>FRANKLYN A. CAINE,<br>21 Dexter Street<br>Dedham, MA 02026 )<br><br>Defendant. ) | Civil Action No.<br>COMPLAINT |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges that:

## SUMMARY

1.      Between 1997 and 2001, Raytheon Company and certain members of its senior management ("Raytheon" or the "company") made false and misleading disclosures and used improper accounting practices that operated as a fraud by masking the declining results and deteriorating business of Raytheon Aircraft Company ("RAC") and inaccurately reporting the company's operating results on both a segmented and consolidated basis. As set forth below, certain of these disclosures and accounting practices were undertaken by or with the knowledge of senior company officers, including Franklyn A. Caine ("Caine"), Raytheon's Chief Financial Officer from April 1999 to December 2002.

2.      Between 1997 and 2001, Raytheon failed to fully and accurately disclose known risks, trends, uncertainties, and other information concerning the deteriorating state of RAC's commuter aircraft business and the negative impact this decline was having on asset values associated with RAC's line of nineteen-seat, turboprop aircraft (the "commuters" or the "1900s")

and, thus, on the company's (including RAC's) results of operations. Raytheon also engaged in several improper accounting practices that delayed and mischaracterized known losses associated with RAC's commuter line during this time period.

3.    As Raytheon's CFO, Caine failed to make or ensure the timely, accurate, and full disclosure of these material trends and uncertainties in the company's public filings during 2000 and 2001 and failed to take sufficient steps to ensure that Raytheon properly accounted for the company's on- and off-balance sheet commuter assets during this time period. Caine also did not ensure that the company maintained an adequate system of internal accounting controls related to these assets.

4.    Had Raytheon properly accounted for its commuter assets, the company would have reported material reductions in RAC's reported operating income of at least $34 million, $22 million, and $21 million at year-end 1998, 1999, and 2000, respectively, which represented 13 percent of the subsidiary's reported annual operating income in each of these periods.

5.    RAC's operating results would have been further reduced by at least $67 million (41 percent) at year-end 2000 had Caine and others in senior Raytheon and RAC management timely and appropriately recognized losses inherent in a planned "soft landing" of the commuter aircraft line. Internal company documents and other information further indicate that, at this time, these senior executives expected commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing," and a charge of $67 million to $240 million would have reduced Raytheon's 2000 profit before taxes by at least 8 to 27 percent. Caine and others, however, caused Raytheon to improperly take this charge in the third quarter of 2001, when the company wrote down its on-balance sheet commuter assets and increased reserves for its off-balance sheet commuter receivables by a total of $693 million after the terrorist attacks of

September 11th. Given the charge that the company should have taken at year-end 2000, Raytheon's third quarter 2001 commuter loss provision was materially overstated by at least 10 to 53 percent.

### JURISDICTION

6.     This Court has jurisdiction over this matter pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v] and Sections 21(d)(3)(A) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d)(3)(A) and 78aa].

### DEFENDANT

7.     Caine, age 57, served as Raytheon's CFO from April 1999 to December 2002.

### BACKGROUND

8.     Raytheon is a Delaware corporation, headquartered in Waltham, Massachusetts. The company is an industry leader in defense, government electronics, space technology, and business and special mission aircraft. Between 1997 and 2001, Raytheon reported between $13 billion and $20 billion in net sales revenue annually and employed between 75,000 to 120,000 individuals. During this time period and continuing through today, Raytheon's securities have been registered with the Commission pursuant to Section 12(b) of the Exchange Act and listed on the New York, Chicago, and Pacific Exchanges.

9.     In the early 1990s, Raytheon was a diversified, multi-national conglomerate, which operated in the defense, electronics, engineering and construction, major appliances and aircraft businesses. The company formed RAC in 1994 through the combination of Beech Aircraft and Raytheon Corporate Jets, and the wholly-owned Raytheon subsidiary has been reported as a separate segment in all of the company's public filings since that time.

10.    RAC manufactures, markets, and services business jets, turboprops, and piston-powered aircraft for the world's commercial, fractional ownership, and military aircraft markets. Due to the cyclical nature of these markets, RAC often experienced fluctuating results. For example, between 1997 and 2001, RAC generated between $2.3 billion and $3.2 billion in net sales revenue for the company annually, accounting for 13 to 19 percent of Raytheon's consolidated annual sales revenues. In addition, while the revenues generated by the commuter aircraft product line represented approximately 1 percent of Raytheon's consolidated net sales revenue during this time period, the company's financing of those sales left Raytheon with substantial recourse obligations related to over $1 billion in commuter receivables that were off the balance sheet, which represented approximately 9 percent of Raytheon's reported stockholder's equity each year between 1997 and 2001.

11.    In 1997, Raytheon completed two multi-billion dollar defense acquisitions in an effort to streamline its operations and solidify its position as one of the nation's largest military contractors. These acquisitions led to a doubling of Raytheon's long-term debt load (increasing it to over $8 billion) and a substantial lowering of Raytheon's credit rating. In an effort to reduce the burden of its debt expense on earnings and cash flows, Raytheon began to divest many of its "non-core" commercial units, using the cash generated by these sales to pay down debt it incurred as a result of its defense acquisitions. RAC was considered for divestiture as part of this plan.

## RAYTHEON'S IMPROPER ACCOUNTING AND DISCLOSURES FOR ITS COMMUTER BUSINESS

12.    Between 1997 and 2001, Raytheon deferred substantial losses related to RAC's line of commuter aircraft. These planes were typically used by small, thinly capitalized airlines to transport passengers along regional or local routes. These carriers were generally seen as

4

significant credit risks, were thus frequently unable to obtain independent financing for their aircraft purchases, and typically lacked sufficient cash on hand to make outright purchases of RAC's commuter aircraft.

13.    As a result, RAC rarely sold its new or used 1900s for cash.  Instead, RAC's sales were regularly financed by the subsidiary's captive finance company, Raytheon Aircraft Credit Corporation ("RACC"), which often offered below-market interest rates and other favorable terms to customers in order to increase demand for the 1900s.  RAC also regularly took used commuter aircraft (model 1900Bs and 1900Cs) in trade for the purchase of newer planes (model 1900Ds), which left RAC with a supply of used 1900s in inventory that required reconditioning and refurbishment in order to be remarketed.

14.    RACC sold most of its aircraft receivables, including commuter financing receivables, into a revolving credit facility funded by an outside bank syndicate, which removed the debt associated with these financed sales from the company's balance sheet.  Under the terms of the credit facility agreement, Raytheon was obligated to re-purchase certain delinquent and defaulted receivables, and the level of recourse to Raytheon on the commuter receivables generally ranged between 75 to 100 percent depending upon the type of financing.  RACC also renegotiated and restructured many of the payment arrangements it had with certain RAC customers in order to keep these customers from becoming overly delinquent or otherwise defaulting on their notes.

15.    As Raytheon's CFO, Caine was aware that the company regularly substituted new or restructured commuter notes for delinquent receivables prior to their triggering any defaults under the credit facility.  Thus, despite the financial stress accumulating in the portfolio's

commuter exposure, Caine was of the view that the portfolio as a whole was always "performing" from an accounting standpoint.

### The Declining Commuter Market between 1997 and 1998

16.     During the late 1990s, RAC began to experience softening demand for its commuter aircraft due to, among other things, shifting consumer preferences, increased government regulation of nineteen-seat aircraft, increased competition in the used aircraft market, and the introduction of regional jets. These and other factors combined to place downward pressure on the sales prices, lease rates, and asset values of these planes. Thus, in 1997, RAC began for the first time to place used 1900s with customers on operating leases and substantially ceased outright sales of used 1900s for cash.

17.     In addition, many of the used commuters that RAC received as returns, repossessions, and trade-ins required significant refurbishment before RAC could re-market them. These refurbishment costs were capitalized as part of the aircraft's book value, which led to "[h]igher book values" that "can and do exceed fair market value." In response, during the mid 1990s, prior to Caine's arrival, RAC adopted a policy of depreciating the used commuter aircraft on an accelerated basis during the life of their leases to "bring down values" to amounts that were more likely to be recovered in later cash sales. By so doing, RAC improperly deferred and re-characterized impairment losses associated with high commuter book values as ordinary depreciation.

18.     As Raytheon's CFO, Caine understood that the book value of all used commuters could not be recovered by cash sales into the then-current market. He was also repeatedly informed by Raytheon's outside auditors that "The most significant accounting issue for used commuters is the realizability of assets. Management's plan is to lease the aircraft, depreciate

6

them down to 50% of book value over 10 years and sell them to the freighter market at the end of the lease."

### The Deferral of Significant Commuter Losses in 1999

19.    Throughout 1999, certain senior Raytheon and RAC officers (including Caine) were made aware of potential negative and adverse trends, uncertainties, and risks related to RAC's commuter business.

20.    In April 1999, Caine's first month as Raytheon's CFO, an outside consultant presented a report to senior management, which stated that the commuter market was "at a turning point," that other "[c]arriers have begun to flood the market with…used 19-seat airplanes," that "lease rates for used 19-seat aircraft [we]re declining," that the "[d]ownward pressure on lease rates w[ould] grow as the surplus of 19-seat aircraft expands," and that "[a]dditional lease rate pressures could impact the company's asset values and re-marketing efforts."

21.    An April 1999 e-mail that previewed this report for Caine informed him that such "surplus" aircraft and "lower lease rates could drive declining asset values and represent a potential material write down" of the commuter assets. Caine subsequently received a copy of the report, and both he and other senior Raytheon officers were briefed on this situation and management's views of it. That same month, during their first meeting, Raytheon's lead auditor discussed issues related to the commuters with Caine.

22.    In May 1999, an internal Raytheon study forecasted that RAC's portfolio of commuter receivables would generate an estimated $95 million in losses due to "[t]he lack of portfolio equity, poor customer credit and payment behavior, high loan-to-value ratios, and the modest level of reserves" established for these assets. That same study identified a "worst case

scenario" that could generate $200 million in additional losses depending upon the impact of the "upcoming introduction" of regional jets.

23.    An e-mail that previewed the conclusions of this internal study further informed Caine that there was an "obvious" need for a "material write-down" of RAC's commuter assets, that these losses were "large and growing," that RAC was engaging in "misleading financial reporting," and that the situation was "as bad as [the author of the study had] seen." Caine subsequently received a copy of the internal study, and both he and other senior Raytheon officers were briefed on both its conclusions and management's views of them.

24.    In June 1999, Raytheon's then-Controller advised Caine that there was an estimated exposure of $300 million to $500 million in marking the RACC portfolio to market.

25.    Also in June 1999, Caine and other senior Raytheon officers received a "response" from RAC to the April and May 1999 external and internal studies.  This response set forth the view of RAC management that there was greater demand for new commuter aircraft than forecast by the company's outside consultant.  With respect to the internal study, RAC's response advised Caine and others that it was "a corporate decision" whether to adopt a proposed "equity model" as an alternative way to establish commuter reserves at RAC, but described the model as "[a] means to build reserves at the expense of current period profits." RAC's response instead proposed a series of "risk mitigation plans" for the commuter portfolio, such as addressing the $95 million commuter exposure identified in the May 1999 internal study through various means (including "third party, no recourse notes" that would provide an estimated $93 million "improvement"). These sales did not materialize, however. Yet, reserves were not adequately increased.

8

26.     In July 1999, Raytheon's investment bankers informed company executives that "[p]ortfolio policies may be masking problems from being recognized," that "actual collateral values may be substantially lower than loan balances," and that, if the company attempted to securitize all of RAC's commuter receivables, the commuter portfolio would be valued "at a material discount to its current book value." Management subsequently decided not to pursue a securitization of these receivables.

27.     In August 1999, as part of an initial consideration to divest RAC, Caine and other senior Raytheon executives were informed that there was "approximately $250 Million - $350 Million risk in [the] $2.4 Billion loan/lease portfolio," and the "risk is likely to approach the high end of this range over time" since "about 40% of loan/lease payments are delinquent" and "business cycle downturn may also drive up defaults [and] reduce residual values of used aircraft."

28.     In the Fall of 1999, after the initial effort to divest RAC failed, Raytheon management attempted to sell RAC's portfolio of aircraft receivables (including its commuter receivables) to an outside finance company. The finance company, however, informed certain Raytheon executives that it would not purchase any of the commuter receivables due to, among other things, concerns over their high loan-to-value ratios and high concentrations in certain customers. The finance company also provided Raytheon personnel with an independent valuation analysis of the 1900s, which stated that the commuter industry was experiencing a "distinct reduction in sales activity" and a "downturn" in leasing activity over the past year. This report also listed estimated market values for the 1900s that were below their book values.

29.     In October 1999, due to unrelated difficulties in its defense businesses and engineering and construction unit, Raytheon announced an unexpected $640 million charge,

which caused the price of the company's stock to fall 44 percent in one day. This charge also led

to a downgrading of the company's bond and credit ratings, and Raytheon management

continued with the strategy to pay down the company's debt by divesting certain "non-core"

commercial units. As part of this strategy, senior Raytheon management undertook a new effort

to divest RAC.

30.     Contemporaneous documents further indicate that, during January 2000

presentations to Raytheon management and the audit committee, the company's outside auditors

informed Caine and others that they had a "continued concern about commuter portfolio

exposure," that "higher refurb[ishment] costs on used commuters" accounted for a $15 million

decrease in RAC's operating profit that year, that the company "need[ed] to relook at FAS 125

calculations based on higher refurb costs," that the used commuter inventory was projected to be

"higher than prior years" in 2000, that, if there is "any slip," the commuter inventory "balance

will balloon."

31.     In addition, following a number of production and accounting problems that arose

at RAC as part of the year-end 1999 close, the subsidiary's CEO stepped down from his

executive position, and Raytheon's CEO traveled to the subsidiary to make it clear that RAC

personnel had to improve their processes to prevent similar issues from occurring in the future.

Upon learning of the year-end closing issues at RAC, Caine immediately revoked the recent

promotion and transfer of a senior RAC financial officer and directed him to return to RAC and

help solve the problems there.

32.     Thereafter, in early 2000, RAC's newly-installed CEO instructed his staff to

critically examine the subsidiary's operations, and RAC's Deputy CFO took the lead role in

identifying issues to be examined. As part of this review, RAC personnel identified a potential

10

$220 million exposure related to the commuter assets on and off the balance sheet. This estimate was calculated by comparing "[p]rices which could be readily obtainable in today's market" to commuter book values. The market values used in the analysis were supplied by the lead commuter sales officials at RAC and averaged from $500,000 to $1 million below the commuter book values.

33.    During this time period, Caine commissioned a review of RAC's commuter program by a separate audit firm and requested that Raytheon's internal audit department also examine RAC's commuter accounting. In addition, as Caine was aware, Raytheon's outside auditors were conducting extended procedures at RAC as part of the year-end audit process given the issues that had previously arisen at the subsidiary, and the potential $220 million commuter exposure was reviewed as part of this process as well. However, based on overly optimistic internal analyses prepared by RAC executives, which indicated that no "event of impairment" had occurred, RAC's commuter assets were not written down nor were RAC's commuter reserves adequately increased at that time.

34.    In January 2000, Raytheon had issued an earnings advisory for the fourth quarter of 1999 and the full year 2000 because of aircraft production delays at RAC, a restatement due to RAC's improper bill and hold accounting, higher interest expenses, a higher effective tax rate, and other unfavorable results in its defense and other businesses. Following this announcement, Raytheon's stock price fell approximately 17 percent in one day. By March 2000, it was reported that Raytheon's bond and credit ratings might be further downgraded "[i]f corrective actions do not lead to material long-term improvements in overall performance and its balance sheet, or if material new operating problems emerge...."

**Raytheon's Improper Accounting and Disclosures in 1999**

35.     Raytheon's SEC filings for 1999 did not contain adequate disclosures of the

negative and adverse trends, uncertainties, risks, and other information related to RAC's

commuter aircraft or the subsidiary's commuter business.

36.     Although certain forward-looking statements in Raytheon's third quarter 1999

Form 10-Q, which was signed by Caine as the company's CFO, did disclose that one of the

fourteen "important factors that could cause actual results to differ" was "the impact of recourse

obligations of Raytheon Aircraft [RAC] due to changes in the collateral value of financed

aircraft," these statements did not reference commuter aircraft by name or describe how the

collateral value of these aircraft were particularly susceptible to negative changes due to the

current and anticipated market conditions for these planes.  In addition, these and other

statements in Raytheon's third quarter 1999 Form 10-Q did not disclose that there were tens to

hundreds of millions of dollars of "risk" associated with the company's portfolio of commuter

and general aviation receivables, as Caine and others at the company were aware at the time.

37.     While Raytheon's 1999 Form 10-K did refer to "commuter valuation costs" as

one of five factors affecting RAC's "decline in operating income as a percent of sales in 1999,"

this disclosure failed to provide adequate information concerning the known material and

adverse risks, uncertainties, and trends posed by the commuters.

38.     In addition, the forward-looking statements in Raytheon's 1999 Form 10-K stated

that "the effect of market conditions, particularly as it affects the general aviation market, the

impact of competing products and pricing, [and] the impact on recourse obligations of RAC due

to changes in the collateral value of financed aircraft" were among the many "factors that could

cause actual results to differ," but did not mention "commuter" aircraft by name or provide

12

adequate information about the negative trends, uncertainties, and risks concerning the commuters that were known to management at the time. Likewise, another set of forward-looking statements in Raytheon's 1999 Form 10-K stated that "continued market acceptance of, and government regulations affecting, 19-seat turboprop commuter aircraft" could affect RAC's future results of operations, but Raytheon did not disclose the significant information that it had about the declining commuter market and the exposures facing the company.

39.    These forward-looking statements were also inconsistent with disclosures in the footnotes to the company's 1999 financial statements, which misleadingly stated that "the Company does not expect to incur any material losses against the net book value of the long-term receivables" because "it is the Company's policy to have the aircraft serve as collateral for the commuter airline receivables;" that "any liability arising from these transactions will not have a material effect on the Company's financial position, liquidity, or results of operations" given Raytheon's experience to date with resale activities and pricing and the Company's plan to continue production into the foreseeable future; and that "[t]hese financial instruments are recorded at estimated fair value. No material gain or loss resulted from the sales of receivables." As certain members of Raytheon management were aware, the fair value of the commuter aircraft serving as collateral for the corresponding receivables was declining given the deteriorating market conditions for these planes. Yet, the company was not adequately increasing its reserves for these anticipated short falls, causing significant potential future liability under its recourse provisions to the revolving credit facility. At the time, Caine considered the off-balance sheet portfolio of commuter receivables to be performing from an accounting standpoint since the ongoing substitutions of new or restructured notes for any troubled receivables avoided actual defaults under the facility.

13

40.     In addition, contrary to the company's footnote disclosures, during 1999, RAC continued an incorrect practice of using FAS 125 gains on commuter receivables sold into the credit facility to set up equally off-setting commuter loss reserves. As a result, Raytheon's reported financial statements did not accurately reflect the accounting impact of declining commuter values.

41.     For example, in the third quarter of 1999, RAC increased its "cushion" for commuter losses by roughly $11 million given the improper FAS 125 gains it recognized on the sale of commuter receivables into the credit facility. RAC, however, subsequently reduced that increase by roughly $7 million in the fourth quarter of 1999 that offset a significant FAS 125 loss caused by a reduction in Raytheon's credit rating. These adjustments represented approximately 17 and 19 percent of the subsidiary's reported operating income/loss in the third and fourth quarters of 1999, respectively.

42.     Also, during 1999, RAC still had not properly applied FAS 125 to its off-balance sheet commuter receivables. As a result, RAC's reported annual operating income should have been reduced by at least $21 million (13 percent) at year-end.

**In 2000, the Commuter Market Continued to Deteriorate**

43.     In 2000, a variety of internal and external sources continued to inform Raytheon and RAC executives that the market for 1900s was in substantial decline. These sources further indicated that there were actual material commuter losses at RAC and that the potential losses associated with the 1900 line were in the hundreds of millions of dollars.

44.     In January 2000, Caine and other senior Raytheon and RAC officers were informed that the company's strategic planning department viewed RAC as having a substantial negative "economic value added," an internal business metric, due in large part to $240 million

in negative value and exposure associated with RAC's off-balance sheet commuter and general aviation receivables.

45.    In February 2000, the same outside consultant that conducted the April 1999 external study reported to Raytheon executives that there would be "[c]ontinued downward pressure on turboprop lease rates due to falling demand for new units and a growing supply of used capacity" and that "demand for new [commuters] will average 7 to 12 sales annually," well below what RAC was planning to manufacture that year.  RAC, however, had exceeded the consultant's sales predictions in the prior year due in part to its continued willingness to accept trade-ins of used commuters for the latest model (1900Ds).

46.    In March 2000, auditors with a major public accounting firm that had been retained to perform a review of RAC's "used commuter program exposures" informed Caine and other members of senior Raytheon and RAC management that "the Company's largest exposure in the [commuter] portfolio is with potential returned aircraft" and that "the book values of certain aircraft in the portfolio exceed the current market values."  In particular, these auditors identified a $115 million "shortfall" associated with RAC's 1900Cs that were on and off the balance sheet, assuming a strategy of selling the aircraft for cash at their fair market value.  The auditors also noted that RAC personnel were "rejecting cash offers on commuter aircraft because of the income statement repercussions . . . [implying that] the carrying amounts of commuter airplanes exceed their fair market values."  The auditors further noted that RAC only wrote down used commuter asset values "when the Company enters into a new finance/lease transaction." The auditors also reported that RAC lacked formal and documented policies and practices concerning the accounting for commuter aircraft, commuter loan restructurings, the creation of commuter valuation reserves, and the monitoring of customer accounts and collections.

15

47.     In April 2000, in response to Caine's request, Raytheon's internal audit department prepared a report for Caine and other members of senior Raytheon and RAC management that examined the items identified as part of the year-end closing process, as set forth in Paragraph No. 32 above.  Caine received a copy of the report's executive summary and certain attachments, which among other things stated that, although there was "[n]o event of impairment prior to 12/31/99" regarding the commuters, there was an "[u]ndetermined but likely to be significant" exposure related to these assets.  The attachments to the executive summary also stated that there was another "undetermined" exposure associated with the subsidiary's commuter bad debt reserve, that the "[n]on-performing segment of [the] portfolio is increasing," and that there was "no formal collections process for non-performing customers" at RAC.

48.     Between April and July 2000, in connection with the company's efforts to sell RAC and/or its portfolio of commuter financing receivables, Raytheon's outside investment bankers provided certain members of senior management with a series of valuation analyses for the commuter receivables.  A July 2000 analysis indicated that a sale of RACC's portfolio of commuter receivables might generate losses of between $63 million and $622 million, depending on the underlying assumptions, and that the value of discounted cash flows on the portfolio was between $200 million and $273 million lower than the total loan balances, depending upon the underlying interest rate assumptions.  Caine received a copy of this report.

49.     Underlying the investment banker's analysis was a July 2000 report from the same major public accounting firm that had previously analyzed RAC's "used commuter program exposures."  This report highlighted significant problems related to the commuters, including high levels of delinquencies and repossessions and "between $10 million and $200 million of collateral exposure" that was not reflected by RAC's accounting and restructuring

methodologies, such as the practice of recognizing losses only upon a new sale or lease of the aircraft instead of upon return or repossession. Caine received versions of this report and was aware of its contents.

50.     Also, in the Summer of 2000, a senior RAC executive informed Caine and another senior Raytheon officer of his significant concern about a problem with the commuters in the "half a billion dollar" range based on his view of the number of idle aircraft that were then in inventory and the substantial number of commuter returns that were forecasted at year-end. Ultimately, this problem was addressed by transferring pension income to RAC to gradually build up commuter reserves.

### The Undisclosed Surplus Pension Income

51.     In the third quarter of 2000, Caine approved the quarterly use of $14 million in surplus pension income at RAC on a going forward basis to increase commuter reserves. This income was generated by an over-funded pension plan that had been retained by Raytheon after the divestiture of another business unit and merged with a RAC pension plan. As a result, RAC recognized $14 million in surplus pension income each quarter on a going forward basis, which was generated by the over-funded pension plan.

52.     As Caine and others were aware, this surplus pension income was going to be used to fund "a general commuter reserve" at RAC, which would increase the company's "ability to absorb losses" and "allow us to continue to sell more 1900Cs versus continuing to lease them." In November 2000, a senior corporate financial officer told senior RAC executives to "[a]nticipate that the $14M per quarter coming from the 'over[-]funded pension income' is available indefinitely." Thereafter, RAC personnel projected that they would continue to receive

$14 million in pension-related income per quarter through at least 2004, which would enable the subsidiary to build up nearly $260 million in commuter reserves.

53.    However, the surplus pension-related income was not separately identified and disclosed in any of the company's SEC filings because management viewed the amounts as immaterial.  In fact, $14 million represented 24 to 353 percent of RAC's reported quarterly operating income/loss between the third quarter of 2000 and the second quarter of 2001 (which ranged from a $4 million operating loss to $59 million in reported operating income).  This income also eliminated the comparability of the segment's current results with prior periods and represented 17 percent of RAC's reported annual operating income in 2000.  In addition, Raytheon's 2000 Form 10-K failed to disclose that, had the surplus pension income from the discontinued operation not been reclassified to RAC's 2000 results, the RAC segment would have experienced a three-year decline in its reported annual operating income from $227 million in 1998, to $163 million in 1999, to $136 million in 2000.

### The Improper "Pooling" of Commuter Aircraft

54.    In the fourth quarter of 2000, at the direction of a senior corporate financial officer and others, RAC personnel instituted an improper "pooling" analysis when testing RAC's on-balance sheet commuter assets for impairment under FAS 121.  This approach pooled aircraft on an aggregate basis, not on a plane-by-plane basis as required by GAAP.  Although Raytheon's outside auditors were informed of the approach, they did not agree with its use.  Pooling further enabled $45.7 million in "cushions" associated with low-book-value aircraft to be used to off-set losses associated with higher-book-value aircraft.  These "benefits" were then used to lower the book values of its used 1900Bs and 1900Cs in small amounts at year-end 2000, and the company's public filings contained no disclosure of the aircraft's declining value.

55.    In addition, even though the company's "pooling" analysis at year-end 2000 suggested that RAC did not need reserves on the 1900s that were held for sale, Caine and others at the company kept $26.4 million in commuter reserves on RAC's books and continued to use the $14 million in excess pension-related income at the subsidiary each quarter going forward to fund continued increases to a "general commuter reserve," which indicated that the anticipated losses associated with the 1900s were greater than the current level of reserves that had been established at RAC.

### The "Soft Landing" for the Commuters

56.    By late 2000, Caine and other senior Raytheon and RAC officers were aware that "[m]arket forces ha[d] created a non-performing asset problem" with the 1900s. Specifically, contemporaneous internal company documents show that, at December 31, 2000, RAC's inventory of used commuters had increased to over 100 airplanes due to an exceptionally high number of commuter returns and repossessions at year-end, and significant commuter returns were expected in the years ahead.

57.    During January 2001, in response to a perceived "market shift" concerning the commuters, RAC prepared a "1900 Business Plan" intended to "steer[] to a 'soft landing' in 4 years" by (i) further reducing the build rate for new 1900Ds to one plane per month (the minimum production rate that the subsidiary could sustain without incurring an operating loss); (ii) moving away from RAC's historic commuter financing and leasing strategies to instead "sell 1900B[s and] 1900Cs for cash" at prices that were "well below" existing book values; and (iii) building up RAC's commuter reserves by at least an additional $240 million through the continued use of surplus pension-related income to facilitate commuter sales.

58.     The "reduced cash sale prices" were approved by Caine and others in senior Raytheon management during January 2001, and the 1900 Business Plan projected that the revised "cash sale" values for the commuters would create at least $60 million in anticipated losses in 2001 alone.  These losses, however, would be charged against the reserves that were being built up at RAC through the use of surplus pension-related income and, thus, would not be reflected in Raytheon's reported financial statements.

59.     Caine and others at the company were aware of the strategy to move to "cash sales," including the effort to "maximiz[e] conversion of 1900Cs for cash" and use "gross margin generated by additional [commuter sales] to fund more sales."  In January 2001, Caine further identified that one of his "goals" for the coming year was to sell "$180 million of 1900B and 1900C inventory, the proceeds of which will be used for debt reduction."

60.     Consistent with the company's new commuter business plan, by February 2001, RAC's commuter sales force was instructed that "the operating lease program they had relied upon [in] the previous few years to place used commuters was gone....  In its place were new lower cash prices on 1900Cs and 1900Ds plus an emphasis on cargo sales."

**Raytheon's Inadequate Disclosures in 2000**

61.     In his introductory remarks during the company's second quarter 2000 earnings call, which was held on July 20, 2000, Caine disclosed that Raytheon was "experiencing some pressure on pricing in the commuter line" and that "refurb[ishment] costs and remarketing costs on used commuters were also higher this year than they were in the same period a year ago." When subsequently asked about this issue during the earnings call, Caine explained that "one of the risk factors that we are trying to keep our eyes on is the commuter market and that would include pricing in the commuter market, so we're not trying to ring any alarm bells.  On the other

hand, it…is one of the risk factors for Raytheon Aircraft." Caine, however, did not disclose relevant information that he possessed concerning the commuters during this call, including the plan to begin recording the reassigned pension income within the RAC segment for the purposes of building commuter reserves.

62.    During the company's third quarter 2000 earnings call, which was held on October 19, 2000, Caine responded to certain questions concerning RAC's commuter aircraft by disclosing that "we have made some adjustments to our planning for the year with regard to used aircraft and that's part of what has hurt RAC cash flow this year to our plan, but those effects are baked into our outlook." Caine also disclosed that "[w]e admit that we've got a lot of work to do between now and the end of the year in order to place not only commuter but also some GA (general aviation) planes that would come back in to us on a trade-in basis, but we think we've captured that in our forecast." Caine, however, again did not disclose relevant information that he possessed concerning the commuters, including that, in the third quarter of 2000, he had approved the merger of the over-funded pension plan with a plan in the RAC segment in order to use the surplus pension income to establish a "general reserve" to "absorb losses" for the purposes of facilitating commuter sales at prices that were below book value.

63.    Similarly, Raytheon's SEC filings for 2000 did not contain adequate disclosures of the negative, adverse, and material trends, uncertainties, risks, and other information described above related to RAC's commuter operations and the subsidiary's commuter line. Raytheon's SEC filings also did not disclose the $14 million in surplus pension income that was available to RAC each quarter on a going forward basis from the over-funded pension plan, or the improper testing of RAC's on-balance sheet commuter assets on a "pooled" basis. In addition, Raytheon's 2000 Form 10-K did not disclose the various elements of the "soft landing" plan for RAC's

commuter line, including the decision to emphasize cash sales at prices that were "well below" book values to address a perceived "market shift" in the commuter business.

64.    Although Raytheon's Forms 10-Q for the second and third quarter of 2000 did cite "pricing pressure on commuter aircraft" as one of the factors affecting RAC's operating income, these disclosures did not adequately describe the substantial negative information concerning the commuters that was known to management at the time. While Raytheon's third quarter 2000 Form 10-Q also disclosed that "a downturn in demand could have a material adverse effect on the company's financial position or results of operations" and its 2000 Form 10-K stated that the company would "continue to...watch for any indications of a downturn in demand for RAC's aircraft," these disclosures incorrectly suggested that management was not yet aware of any such downturn in the commuter aircraft market or its severity.

65.    In addition, while Raytheon's SEC filings for 2000 contained disclosures concerning the effect of overall market conditions in the forward-looking statements, these disclosures did not provide adequate information concerning the deteriorating state of the commuter aircraft market and the negative effect that this decline was having on RAC and commuter asset values. For example, Raytheon's 2000 Form 10-K included the forward-looking statement that the company's "operating results may vary significantly over time for a variety of reasons, many of which are outside of our control," such as "the impact on recourse obligations at Raytheon Aircraft due to changes in the collateral value of financed aircraft...[and] general economic conditions, particularly the cyclical nature of the general aviation...market[] in which we participate." These disclosures made no mention of "commuter" aircraft by name and did not reflect that company management was aware of significant losses related to RAC's commuter assets and anticipating that these losses would continue to grow in the future.

66.    Also, other forward-looking statements in the company's annual report disclosed that some of the "[i]mportant factors that could cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact on recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly commuter aircraft." These statements were contrary to other disclosures in the footnotes to the company's 2000 financial statements, which misleadingly stated that the company had a secure line of commuter financing receivables, that any liability resulting from the sale of commuter receivables into the revolving credit facility "will not have a material effect on the Company's financial position, or results of operations" given Raytheon's "experience to date with resale activities and pricing and the Company's plan to continue production into the foreseeable future," and that "[n]o material gain or loss resulted from the sales of receivables in 2000, 1999, or 1998." These disclosures did not reflect a move to cash sales of commuter aircraft at prices that were well below book value, a significant reduction in the 1900D build rate, actual material commuter losses at RAC, and potential losses associated with the 1900 line in the hundreds of millions of dollars.

67.    The footnotes to Raytheon's 2000 financial statements also disclosed that the company sold commuter receivables to a bank syndicate and other financial institutions with recourse against the company "at varying percentages, depending upon the character of the receivables sold." These footnotes further stated that the outstanding balance on those receivables was over $1.7 billion year-end 2000. However, these footnotes did not disclose the high degree of recourse against the company on commuter receivables, which ranged up to 100 percent, and also failed to adequately disclose the significant declines in the commuter market and the recent restructuring of several commuter receivables to keep them from defaulting.

68.    Caine reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 61 to 67 above.

**Raytheon's Improper Accounting in 2000**

69.    As described in Paragraph Nos. 51 to 53 above, the establishment of $56 million in additional commuter reserves through the transfer of surplus pension income to RAC between the third quarter of 2000 and the second quarter of 2001 was inconsistent with GAAP. No adequate contemporaneous documentation supported the amount of these commuter loss provisions, and the amount reserved corresponded only to the amount of the surplus pension income available. Caine and others were also aware of the surplus pension income and how it was used to increase commuter reserves.

70.    Although Raytheon's outside auditors did review the use of the surplus pension income to establish additional commuter reserves at RAC, the auditors informed Caine and others in October 2000 that there was a "need to enhance documentation" on these reserves. According to Caine, he was advised that each quarterly reserve increase was supported by the appropriate accounting analysis. However, Caine was never provided with any such analyses supporting the need for equal $14 million additions to the commuter reserve quarter after quarter.

71.    In 2000, Raytheon's outside auditors also informed Caine and others that it was "not appropriate" to pool commuter aircraft when testing for impairment under FAS 121 because the planes "d[id] not represent a large pool of homogenous assets." The auditors, therefore, proposed a $12 million audit adjustment, which represented the supposed "benefit" that the company obtained through pooling. With the knowledge of Raytheon's auditors, this adjustment was not booked because the amount was considered to be immaterial to the company's consolidated financial results. Caine and others were aware of this decision. The $12 million

24

audit entry, however, represented approximately 7 percent of RAC's reported operating income for 2000 and, thus, was material to the financial results reported for that segment.

72.    In 2000, Raytheon's outside auditors further informed Caine and other senior Raytheon and RAC executives that RAC "ha[d] not appropriately accounted for the gain or loss on notes sold to [the revolving credit facility]" or properly measured other components of the FAS 125 calculation and, thus, offered to sell RAC an improved FAS 125 model. After some initial "resistance" from a senior corporate financial officer and another senior RAC financial officer, the company did ultimately purchase and implement at the subsidiary the FAS 125 model proposed by the auditors before filing the 2000 Form 10-K. However, this model also failed to comply with GAAP. Because much of the data serving as the inputs for this model was incomplete and inaccurate, the new FAS 125 model materially misestimated the amount of RAC's various off-balance sheet assets and liabilities.

73.    Also, the new FAS 125 model calculated a $22 million overstatement related to prior period FAS 125 gains. As Caine and others were aware, this proposed audit entry was not made because, among other reasons, it was deemed immaterial to the company's consolidated financial results. Such a charge, however, would have reduced RAC's reported annual operating income for 2000 by 13 percent (from $164 million to $142 million) and, thus, was material to the segment.

74.    Together, the $12 million proposed audit adjustment for incorrect FAS 121 accounting and the $22 million proposed audit adjustment for RAC's incorrect FAS 125 accounting would have reduced RAC's reported operating income by 20 percent.

75.    Finally, had senior Raytheon and RAC management timely recognized losses inherent in the planned "soft landing" of the commuter aircraft line, the company would have

25

been required to take a charge of at least $67 million at year-end 2000, and contemporaneous internal company documents and other information indicate that Caine and other senior Raytheon and RAC officers were expecting commuter losses of $240 million given the cash sales prices that had been approved in the "soft landing." A charge of $67 million to $240 million at year-end 2000 would have reduced RAC's reported annual operating income by at least 41 to 146 percent and Raytheon's 2000 profit before taxes by at least 8 to 27 percent.

76.    Caine reviewed the accounting described in Paragraph Nos. 69 to 75 above, and he knew or should have known that it was inaccurate.

**In 2001, Caine Continued to Be Aware of the Ongoing Decline in the Commuter Market, and the Commuter Assets Were Written Down after September 11, 2001**

77.    Throughout 2001, Caine and other senior Raytheon executives continued to be aware of the ongoing decline of the commuter market and how this decline was creating serious operational issues at RAC, including substantial actual and anticipated losses associated with the 1900s on and off the company's balance sheet.

### The First Quarter of 2001

78.    In early 2001, Caine and others at Raytheon attempted to purchase risk insurance for the cash flows associated with the 1900D notes receivable in the company's off-balance sheet commuter portfolio. During these discussions, the insurer informed certain Raytheon and RAC executives that the $1.1 billion book value the 1900Ds, which RAC had financed and were off Raytheon's balance sheet, was approximately 20 percent higher than a third-party's evaluation of their current market value. These executives subsequently briefed Caine on their discussions with the insurer as well as their conclusions and analyses of the situation. Ultimately, Caine and others decided not to pursue an insurance strategy for the commuters since it was cost prohibitive given the amount of coverage provided.

79.     By April 2001, Caine and others at Raytheon were aware that RAC had not sold any used commuters for cash under the "soft landing" plan during the first quarter and that recent offers for used 1900Cs were "in the $1.2M range," which was "far below" the initial "cash sale" estimates of $2.2 million approved by management as part of the "soft landing." Caine and others were further aware that "each cash order looks like it will require a great deal of focus and effort to get the ball over the goal line. Simply put, it's harder to sell for cash, but…we knew this 'going in.'" In response to this statement, one senior Raytheon executive explained that $1.5 million was a "more realistic" price for these used aircraft and further emphasized the need to "raise cash" on these sales.

### The First Quarter 2001 Earnings Call

80.     During the first quarter 2001 earnings call, which was held on April 19, 2001, Caine omitted reference to "commuter" aircraft from his introductory remarks, stating instead that "Raytheon Aircraft revenue is down $178 million, $154 million related to new aircraft deliveries and about $43 million related to a decline in used aircraft sales" and that, "[i]n Raytheon Aircraft, we see some weakness in Q-1 from a bookings standpoint…. [O]ur booking in the first quarter of this year were weak, relative to where we have been historically and also weak relative to our plan for the year. The used aircraft market is also of concern to us and we will continue to watch the numbers of planes available on the used aircraft market as we move through the second and third quarters. Our existing backlog, though, at Raytheon Aircraft is strong and appears to be stable. We do have planes in forecast for sale in…Q-2, Q-3, and Q-4, which as of yet are unsold. That is not unusual for us and we are watching carefully to see what's happening in the market demand for both new and used aircraft and are going to be taking

a close look at our planned production rates for the second, third, and fourth quarters as we move through the next 30 days."

81.    In addition, in response to an analyst question concerning "the 1900D used aircraft model" and whether management had "seen weakening used aircraft prices there," Caine stated that, "during the first quarter, we...had a stronger level of activity around both new and used 1900Ds that we might have planned for the year.... I don't want you to take that to be too strong a positive signal, but...I would say that the 1900D was not a disappointment in the first quarter." Caine, however, did not disclose that, in January 2001, he and other senior Raytheon executives had approved a reduction of the build rate for new 1900Ds to one aircraft per month (the minimum line rate that RAC could sustain without incurring an operating loss). Caine also did not disclose the January 2001 reduction in used 1900D sale prices by as much as $900,000 below their average book value. Caine further did not disclose the other elements of the "soft landing," including the reduction in sales prices for used 1900Cs to roughly $1 million below their average book value and the continued quarterly use of $14 million in pension-related income at RAC for the purposes of building up commuter reserves to facilitate sales at these reduced prices. At the time, $14 million represented over 14 percent of the company's first quarter 2001 consolidated income from continuing operations of $97 million.

82.    In response to another question concerning the previously discussed "weakness in the new and used aircraft market," Caine did state that "we have a number of airplanes in our outlook for Q-2, Q-3, Q-4 which, as of yet, are unsold... [T]he percentage unsold as of today is probably a little higher than the percentage unsold was at this same time a year ago, and so we're watching this carefully, and...we're going to be taking a close look at our production rates over the course of the next 30 days." Caine, however, did not disclose that RAC had not sold any

used commuters for cash under the "soft landing" plan during the first quarter of 2001 or that
recent cash offers on used commuters were roughly $1 million below the previously approved
"soft landing" prices, as he was informed on April 17, 2001 (two days before the first quarter
2001 earnings call).

### The Second Quarter of 2001

83.    In May 2001, Caine received an e-mail, which indicated that a senior corporate
financial officer disapproved of the sale of $200 million in commuter receivables to an outside
party since it would occur at a $20 million (10 percent) discount.  Even though this senior
corporate financial officer was informed that RAC's "surplus" pension-related reserves could be
used to off set this loss, he explained that "we need to understand what a 10% loss on the $200M
RACC portfolio sale does to our collateral value on the rest of the portfolio.  Any use of $20M of
pension reserves will severely limit our ability to sell on-balance sheet aircraft for cash."

84.    In June 2001, a RAC sales forecast informed Caine and others that "[a] clear trend
exists that prices will have to continue to be lowered to move inventory…. In order to get more
cash sales in Q4, the price will have to be lowered to between $1.1 - $1.5 MM.  This could create
accounting issues."  Caine and others subsequently received an e-mail from a senior executive in
RAC's commuter business, which stated that it would be necessary to "discount heavily" and
offer 1900Cs at between $1.1 million to $1.5 million in order to make sales for cash.  These
officers were further informed that RAC's 2001 sales forecast was "contingent" upon these
values.

85.    As Caine was aware, these transactions were subsequently blocked by a senior
corporate financial officer and others in the financial organization because "these deals could
cause a write down of the entire portfolio and, as a result, we need to sell the airplanes at a higher

value." As set forth in internal company documents, "[w]e cannot afford to change NRVs [the Net Realizable Values of the aircraft] below $2,500,000" due to the income statement repercussions for the company. "Price integrity issues and limited reserves prevent us from lowering prices to meet a large portion of the market. Market pricing will require additional reserves."

86.    In July 2001, at Caine's request, the company's investment bankers provided Raytheon management with an update of earlier analyses of the company's commuter portfolio. This analysis indicated that, at the close of the second quarter, there was at least $113 million to $198 million in losses associated with the on- and off-balance sheet commuters given the difference between their book and assumed collateral values. This analysis also indicated that the value of the discounted cash flows from the on- and off-balance sheet commuters were $431 million to $528 million below their total book values. Caine received a copy of this report.

### The Second Quarter 2001 Earnings Call

87.    During the second quarter 2001 earnings call, which occurred on July 19, 2001, Caine stated that "we also had considerably fewer commuter aircraft shipped this year relative to last year" and the "[n]umber of used aircraft sales was down considerably." Caine also stated that inventory levels at RAC had increased and were, among other things, "a function of our ability to remarket used commuter aircraft...in a tougher environment for used aircraft." Caine further presented a slide that disclosed the historical and forecasted inventory levels of commuter aircraft at RAC from June 2000 through December 2001.

88.    In response to an analyst question concerning Raytheon's off-balance sheet obligations, Caine stated that, "[o]n the commuter side...we watch the performance of those assets and the liquidity and credit quality of our customers very closely. We have reserves...

against the assets in the portfolio in the aggregate and in some cases we apply specific reserves to specific transactions if we have concerns about an individual credit or an individual asset. We review all of that regularly.... [T]he analysis that we have done with regard to the aging of the receivables and the risks associated with some of the receivables, particularly in commuter, has probably heightened our sensitivity relative to where we might have been a year ago. I would say that aging has gotten to be a little older. We have more receivables that are, say, 90-plus days past due today than we did a year ago or two years ago. That's always a concern. That's not necessarily a problem, but it is certainly a concern and it's one that we manage actively. I would also tell you that our reserve levels in the portfolio are higher today than they were a year ago and we add to those reserves periodically, as required."

89.     However, Caine did not disclose that members of senior Raytheon and RAC management had been restructuring the payment arrangements of several major commuter customers to keep them from defaulting on their notes payable and, thus, triggering Raytheon's recourse obligations to the credit facility. Caine also did not disclose that, by the second quarter of 2001, $56 million in pension-related income had been used at RAC to increase commuter reserves (including $28 million in the first half of 2001, which represented 13 percent of the company's consolidated income from continuing operations for the six months ended July 1, 2001). Furthermore, as set forth in Paragraph No. 69, the way in which these additional commuter reserves were established through the use of pension-related income did not comply with GAAP.

90.     In addition, in response to a follow-up question by another analyst, Caine stated that the increases in the commuter reserves at RAC would be reflected in the segment's reported "operating income." However, as Caine was aware, these reserves were being established

through the undisclosed use of $14 million in pension-related income each quarter, which also occurred "above the line." As such, Raytheon's financial statements did not accurately reflect the negative impact that these commuter reserves were having on RAC's reported operating income.

91. Furthermore, one week before the July 2001 earnings call, Caine received an analysis from Raytheon's investment bankers, which indicated that there was upwards of $198 million in losses associated with the on- and off-balance sheet commuters at the close of the second quarter given the difference between their book and collateral values and that the value of the discounted cash flows from the on- and off-balance sheet commuter receivables were as much as $528 million below their total book values. And, one day before this call, Caine was informed that (i) the market price for future fleet sales of used 1900Cs was between $1.1 million and $1.5 million per plane and (ii) senior executives in his finance department were blocking these transactions because they "could cause a write down of the entire portfolio and, as a result, we need to sell the airplanes at a higher value." Caine, however, did not disclose this information during the July 2001 earnings call.

### The August 2001 Commuter Summit

92. In August 2001, Raytheon convened a "commuter summit" at its corporate headquarters to discuss the state of the commuter market and the negative effect this decline was having on RAC's commuter business. At this meeting, an outside consultant informed Caine and others in senior Raytheon and RAC management that "[c]ompetitive market pressures are intense. Critically, they are not anticipated to ease anytime soon…. Turboprop aircraft orders have stagnated at best…. Only a handful of companies still operate 19-seat turboprops…. The prognosis for U.S. 19-seat operators is not very good…. Downward pricing pressure is not

anticipated to ease as the number of surplus 20 to 35 seat turboprop aircraft grows, making them more attractive as 19-seat replacements…. With turboprop aircraft demand falling and supply raising, pricing must reflect basic market conditions not internal benchmarks."

93.     At this "commuter summit," another outside consultant reported that estimates of fair market value for the commuters were, on average, $2 million below book value for the 1900Cs and $1.3 million below book value for the 1900Ds. At the time, the company had over 130 1900Cs and nearly 320 1900Ds on and off the balance sheet, making for an estimated exposure of approximately $676 million.

### The First and Second Quarter 2001 Forms 10-Q

94.     Despite the substantial information that management possessed concerning the decline in RAC's commuter aircraft business and the erosion of commuter asset values, the company's first quarter 2001 Form 10-Q did not adequately disclose these adverse views of and developments in RAC's commuter operations, including management's decision to move from a leasing to a cash sales strategy for used commuters.

95.     For example, although this filing did state that, "[d]uring the first quarter of 2001, RAC experienced softness in orders for new and used commercial aircraft," that Raytheon "remains concerned about the market outlook at RAC," and that "[w]eak demand for RAC's new or used aircraft could have a material adverse effect on RAC's financial position and results of operations," these disclosures discussed only "commercial" aircraft in general, which covered several other product lines in addition to the commuters. Because these and other disclosures covered all of RAC's "new and used" commercial aircraft, the company's filing did not make adequate disclosure of the negative risks and trends related to the commuters that were known to senior management at the time.

96.    Raytheon's second quarter 2001 Form 10-Q, which was filed one week after the August 2001 commuter summit, also did not adequately disclose the negative risks and trends associated with the company's commuter aircraft. For example, Raytheon's Form 10-Q disclosed that RAC's second quarter 2001 "[o]perating income was down primarily due to the lower sales volume and margin pressure on T-6A, Beechjet, and used aircraft due to the current market environment. During 2001, RAC experienced softness in orders for new and used commercial aircraft. The Company remains concerned about the market outlook at RAC. During the second quarter of 2001, RAC responded to a softening market by announcing workforce reductions and adjustments in production rates." These disclosures made no specific mention of "commuter" aircraft and failed to adequately disclose the negative risks and trends concerning the commuters that were known to senior management at the time.

97.    The only disclosure specifically referencing "commuters" in the Management Discussion and Analysis section of Raytheon's second quarter 2001 filing concerned "[t]he aging on RAC's commuter customer financing receivables [which] has deteriorated over the past year. Non-performance on these loans and leases, in the aggregate, could have a material adverse effect on the Company's liquidity." At this time, senior Raytheon officers had been informed that there were hundreds of millions of dollars of actual and potential losses associated with these receivables based on the analyses that the company's investment bankers had performed and the other information the company had received. Thus, Raytheon's Form 10-Q failed to adequately disclose the significant declines in the commuter market, recent restructuring of several commuter customers to keep them from defaulting on their notes payable, and the substantial financial repercussions that would follow given the company's recourse obligations to the bank facility.

34

98.     Also, both of Raytheon's first and second quarter 2001 filings contained inadequate disclosures about the potential effect of market conditions in their forward-looking statements.  In particular, both Forms 10-Q stated that of the many "[i]mportant factors that could cause actual results to differ" were "the effect of market conditions, particularly in relation to the general aviation and commuter aircraft markets; [and] the impact of recourse obligations of Raytheon Aircraft due to changes in the collateral values of financed aircraft, particularly commuter aircraft."  These disclosures, however, failed to provide investors with sufficient information concerning the negative trends and risks associated with the commuters that were known by management at the time.  The inclusion of these disclosures in the company's forward-looking statements gave the inaccurate impression that Raytheon was not presently facing any risks associated with its on- and off-balance sheet commuter assets during these time periods.

### Raytheon's Equity Offering

99.     In April and May 2001, Raytheon filed a Form S-3 and prospectus supplements in connection with its $3 billion shelf registration and takedown of equity securities.  These filings contained materially misleading statements and omissions concerning the commuters because:

(a)     Raytheon's Form S-3 incorporated prior filings by reference and thus repeated the false and misleading statements from those periodic reports.  In addition, the Form S-3 did not disclose the material and adverse trends and uncertainties that were known to management at the time concerning the commuters.  The Form S-3 also incorporated by reference "any future filings made by us…until we sell all of the securities."  As alleged below, these future filings were also misleading.

(b)     In addition, the forward-looking statements of the Form S-3 contained disclosures about "regional aircraft" and "price pressures within the market" but did not

specifically reference commuters by name.  Similarly, these forward-looking statements disclosed that "a decline in demand in the market for our aircraft, would have an adverse effect, which may be material, on our financial results," but did not describe the declining commuter market or RAC's deteriorating commuter business.  Likewise, other forward-looking statements disclosed that "[t]he value of our securities may fluctuate as a result of considerations that are difficult to forecast, such as…the impact on recourse obligations at Raytheon Aircraft Company due to changes in the collateral value of financed aircraft…and general economic conditions, particularly the cyclical nature of the general aviation and other commercial markets in which we participate."  These forward-looking statements, however, did not specifically mention the known risks posed by the deteriorating state of the commuter market, RAC's growing inventory of used commuter aircraft, or the over-valued commuter financing receivables that were off the company's balance sheet.

100.    Caine reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 94 to 99 above.

### Raytheon's Improper Accounting and Disclosures in the Third Quarter of 2001 and at Year-End

101.    Although Raytheon's on- and off-balance sheet commuter assets were over-valued by hundreds of millions of dollars as of August 31, 2001, it was not until after the terrorist attacks on September 11th that management began the process of a write down.  However, much of the information used to estimate fair value for the commuters was from three or four weeks earlier in August of 2001, and none of the publicly available data used in the write-down analysis was post-September 11th.  Caine and another senior corporate financial officer also considered offers that RAC had received from commuter customers during the most recent year, even

though these officers had previously refused to sell planes for these prices in July 2001 since

"these deals could cause a write down of the entire portfolio...." Also, a post-September 11th

"top down, market study" upon which a senior Raytheon officer and Caine relied to support the

final charge estimated that there was $400 million to $500 million in pre-existing exposure on

the commuters as of July 2001. This amount represented roughly 60 to 70 percent of the $693

million charge that was ultimately taken by the company. As the Vice President of Investor

Relations informed senior management near completion of the write down, a survey of buy- and

sell-side analysts prior to the upcoming earnings call indicated that "defense companies get a free

pass this quarter" given recent events. These analysts were further "expecting a $400-500

million charge" on the commuters, and they would be "irritated" with the company "if we do not

take this opportunity to adjust these values."

102.    Thus, in the third quarter of 2001, Raytheon stated that it had taken a $693 million

loss provision related to RAC's commuter aircraft as "a result of continued weakness in the

commuter aircraft market and the impact of the events of September 11, 2001." This misleading

statement was repeated in substance in the company's 2001 Form 10-K. Given the charge that

the company should have taken at year-end 2000 to properly account for RAC's on- and off-

balance sheet commuter assets and the $240 million in commuter reserves that company

management planned to build to cover anticipated losses, the $693 million commuter loss

provision that Raytheon took in the third quarter of 2001 was materially overstated by at least 10

to 53 percent.

103.    Raytheon's SEC filings also did not disclose that the third quarter 2001 commuter

loss provision was largely determined by implementing for the first time a market-based measure

of portfolio loss under FAS 140, the successor to FAS 125. Contrary to Raytheon's prior public

disclosures, the company's recourse liability obligations on the commuter receivables sold into the credit facility had previously been calculated through a pooled, probable loss analysis.

104.    Caine reviewed and approved the inaccurate filings and disclosures described in Paragraph Nos. 102 to 103 above. Caine further reviewed the accounting described in Paragraph Nos. 102 to 103 above, and he knew or should have known that it was inaccurate.

**THE IMPACT OF THE IMPROPER ACCOUNTING AND DISCLOSURE PRACTICES**

105.    As a result of the improper disclosure and accounting practices described above, Raytheon filed at least nine quarterly reports, three annual reports, and two registration statements that contained materially false and misleading disclosures and financial statements.

**FIRST CLAIM**
**Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act**

106.    Paragraphs 1 through 105 above are realleged and incorporated herein by reference.

107.    Raytheon filed registration statements on April 6, 2001 and October 22, 2001 in connection with securities offerings by Raytheon that incorporated certain false and misleading periodic reports previously filed by the company.

108.    In these offers or sales of securities, Caine, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the offer or sale of Raytheon securities, (a) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and (b) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

109.    By reason of the foregoing, Caine violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## SECOND CLAIM
### Aiding and Abetting Violations of
### Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

110.    Paragraphs 1 through 109 above are realleged and incorporated herein by reference.

111.    As alleged more fully above, Raytheon filed with the Commission materially false and misleading financial statements as part of its annual reports on Form 10-K and quarterly reports on Form 10-Q, respectively.

112.    As a result of the foregoing, Raytheon violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

113.    Caine knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

114.    As a result of the foregoing, Caine aided and abetted Raytheon's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

## THIRD CLAIM
### Aiding and Abetting Violations of
### Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 13b2-1

115.    Paragraphs 1 through 114 above are realleged and incorporated herein by reference.

116.    As alleged more fully above, Raytheon failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets. Raytheon also directly or indirectly, falsified or caused to be falsified certain books, records, and accounts. In addition, Raytheon failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP, or any other applicable criteria, and to maintain accountability for assets.

117.    As a result of the foregoing, Raytheon violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

118.    Caine knowingly or recklessly provided substantial assistance to Raytheon in connection with its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

119.    As a result of the foregoing, Caine aided and abetted Raytheon's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a)    ordering Caine to pay a civil penalty in the amount of $125,000 pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)] and to disgorge certain bonus amounts of $550,000, plus interest

accrued thereon in the amount of $156,072; and

      (b)      granting such other and further relief as this Court deems just and proper.

Dated: March 15, 2007
      Washington, DC

 

John D. Worland, Jr.
Timothy N. England
Beth Collier Groves
Christopher J. Stewart
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-0713
(202) 551-4438
(202) 772-9231 (Fax)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Franklyn A. Caine |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888 (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Christopher J. Stewart Securities and Exchange Commission 100 F Street NE Washington, DC 20549 202-551-4542 | Joseph I. Goldstein Mayer Brown Rowe & Maw 1909 K Street NW Washington, DC 20006 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ◉ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ◉ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

## ◉ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food & Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☒ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Settled civil action for violations of the federal securities laws under 15 U.S.C. 77q(a)(2) and (3) and 15 U.S.C. 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** [ ] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☐  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**  (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  3/15/07    SIGNATURE OF ATTORNEY OF RECORD _____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.